RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0081p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant,*

    *v.*

DEJUAN MCCRANEY,

        *Defendant-Appellee.*

No. 11-3573

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:10-CR-304-1—Lesley Brooks Wells, District Judge.

Decided and Filed: March 21, 2012

Before: GUY, COLE, and ROGERS, Circuit Judges.

———————————

**COUNSEL**

**ON BRIEF:** Duane J. Deskins, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellant. Thomas E. Conway, LAW OFFICE OF THOMAS E. CONWAY, Cleveland, Ohio, for Appellee.

———————————

**OPINION**

———————————

RALPH B. GUY, JR., Circuit Judge. The United States of America appeals from the order granting the defendant's motion to suppress evidence which the district court found was the product of an illegal automobile search. Narrowing its arguments on appeal, the government contends that the search was permissible either as a search incident to arrest consistent with *Arizona v. Gant*, 556 U.S. 332 (2009), or as a search based on reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968), and *Michigan v. Long*, 463 U.S. 1032 (1983). For the reasons that follow, we find no error and affirm.

1

## I.

Defendant DeJuan McCraney was charged with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Defendant moved to suppress evidence seized in the automobile search—namely, the loaded .44 caliber revolver found under the driver's seat—as well as statements he later made admitting that the firearm belonged to him. After an evidentiary hearing, the district court granted the defendant's motion to suppress in an order entered April 22, 2011. The government filed an appeal, which this court has expedited for decision. Except as noted, the facts are not in dispute.

On appeal from the grant or denial of a motion to suppress, this court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004). In doing so, we must view the evidence in the light most favorable to the district court's factual findings. *United States v. Gooch*, 499 F.3d 596, 600 (6th Cir. 2007).

## II.

### A.     Facts

At about 12:50 a.m., on July 4, 2010, Massillon Police Officer Curtiss Ricker was on routine patrol traveling eastbound on Lincoln Way in Massillon, Ohio. Defendant McCraney was traveling in the opposite direction as the passenger in a Buick Riviera that was registered to him and being driven by Rudolph Ammons. The Buick approached and passed Ricker without dimming its high-beam headlights, which is a traffic violation. Ricker made an immediate U-turn, followed the Buick for a few blocks, and observed an oncoming car flash its lights at the Buick. Ricker also testified that, following one car length behind the Buick, he observed both the driver and passenger lean over toward the floor of the car. Ricker explained that, in his experience, this kind of movement led to the discovery of contraband or firearms "95 to 100 percent" of the time. McCraney, however, testified that neither he nor Ammons had reached down as Ricker described.

Although Ricker did not activate his lights or siren, Ammons came to a stop and gestured to Ricker as if to flag him down.  Not wanting to stop in the roadway, Ricker drove a short distance farther and pulled into a large parking lot belonging to the Massillon Moose Lodge.  Ammons followed and once he stopped, Ricker swung his patrol car around to face the front of the Buick and directed his spotlight into the passenger compartment.

Ricker approached and instructed the occupants to show their hands.  They complied, and Ricker asked Ammons for identification and insurance information. Ammons explained that they were lost, provided an Ohio ID (not a driver's license), and asked for directions to Interstate 77.  Taking the ID, Ricker returned to his patrol car, called in to check the driver's identification, and requested backup.  While Ricker was doing this, the defendant attempted to get out of the Buick twice, seemed to be trying to get Ricker's attention, and complied when Ricker instructed him to get back into the Buick.  McCraney testified that he was trying to give Ricker his vehicle registration and insurance information.

Once Massillon Police Officer Michael Maier arrived on the scene, Ricker radioed to him and asked that he run a check on the temporary vehicle registration tag. According to Ricker, Maier stopped behind and to the side of the Buick and then advised Ricker that he saw the occupants move as if bending down to reach under the seat.  At the suppression hearing, McCraney again denied that either he or Ammons had made such movements.  Maier's check revealed that the Buick was registered to McCraney, who also had a suspended driver's license.

Ricker approached the Buick, explained that Ammons did not have a valid license, and declined to lead them to I-77 because it was outside of his jurisdiction. McCraney then moved over to the driver's seat and started the Buick, but Maier interjected that McCraney had a suspended license as well.  Ricker admitted during the suppression hearing that he would have let McCraney drive away if his driver's license had been valid.  Ricker testified that since it was not, he decided that he would arrest them both—Ammons for driving with a suspended license and McCraney for unlawful

entrustment. However, without placing them under arrest, Ricker permitted McCraney to call his aunt, May Weems, and arrange for her to come get them and the Buick. Weems testified that she spoke to an officer who told her to come pick them up, but no one was there when she arrived 25 minutes later.

Only a minute after McCraney ended the conversation with his aunt, and with five officers and four patrol cars now on the scene, Ricker asked McCraney and Ammons to get out of the Buick. When they did so, they were patted down for weapons and instructed to stand near the rear of the Buick. Not yet in handcuffs or formally under arrest, McCraney and Ammons stood two or three feet from the rear bumper with three officers standing around them while the other two officers searched the passenger compartment. After the firearm was found under the driver's seat, McCraney and Ammons were handcuffed, placed under arrest, and transported from the scene. The Buick was impounded and towed away. McCraney, a convicted felon, later admitted to his probation officer that the revolver belonged to him.

## B.     Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Since McCraney did not challenge the search as the product of an illegal stop or unreasonable detention, we need not determine whether the encounter was initially consensual or determine precisely the point at which the seizure occurred for Fourth Amendment purposes. It is sufficient to conclude that there was a seizure.[1] There is no dispute that Ricker had probable cause to stop and arrest Ammons for failing to dim the high-beam headlights in the face of oncoming traffic. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Nor has McCraney challenged the existence of probable cause to arrest him for unlawful entrustment once it was discovered that the Buick was registered to him and that Ammons did not have a valid driver's license.

---

[1]There is no question that Ricker restrained the defendant's liberty through a show of authority—to which the defendant submitted initially and by getting back into the Buick—and that a reasonable person under the circumstances would not have believed he was free to leave and ignore the officer's requests. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005).

Despite the existence of probable cause to arrest, however, the search at issue also must be justified under an exception to the warrant requirement. We begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Of the recognized exceptions, the government relies only on search incident to arrest and reasonable suspicion to justify the warrantless search in this case.[2]

### 1.    Search Incident to Lawful Arrest

This exception authorizes the warrantless search of "the arrestee's person and the area 'within his immediate control.'" *Chimel v. California*, 395 U.S. 752, 763 (1969). As the government observes, a formal custodial arrest need not precede the search as long as the formal arrest follows "'quickly on the heels of the challenged search'" and "the fruits of that search are not necessary to sustain probable cause to arrest." *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004) (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 110-11 n.6 (1980)); *see also United States v. Dotson*, 246 F. App'x 897, 903 (6th Cir. 2007). The exception was later extended to allow searches of the passenger compartment of an automobile incident to the lawful custodial arrest of its occupants or recent occupants. *New York v. Belton*, 453 U.S. 454 (1981); *Thornton v. United States*, 541 U.S. 615, 622 (2004).

In *Gant*, which was decided more than a year before the search at issue, the Supreme Court clarified that this and other circuits had incorrectly understood *Belton* to "allow a vehicle search incident to the arrest of a recent occupant even if there [was] no possibility the arrestee could gain access to the vehicle at the time of the search." *Gant*, 556 U.S. at 341. Ct. at 1718. Emphasizing that this reading would "untether the rule

---

[2]The government has abandoned the claim that the search was a valid inventory search under *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). *See United States v. Landon*, 449 F. App'x 500, 502 (6th Cir. 2011) ("inventory search must be conducted 'according to standard police procedures' and may not be undertaken for 'purposes of investigation'") (citation omitted).

from the justifications underlying the *Chimel* exception," the Court held that police are authorized to search a vehicle incident to a recent occupant's arrest only if: (1) "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," *Gant*, 556 U.S. at 343; or (2) "it is reasonable to believe the vehicle contains evidence of the offense of arrest, " *id*. at 351. Only the first justification is at issue in this appeal.[3]

The government argues that it was error for the district court to ignore the real possibility that McCraney or Ammons could have gained access to the passenger compartment at the time of the search. The government seems to suggest that a search would be improper only when the possibility of access was as remote as in *Gant*, in which "the five  officers [] outnumbered the three arrestees, all of whom had been handcuffed and secured in separate patrol cars." *Id*. at 344. The holding was not stated in terms of these facts, but rather, with the conclusion that "Gant clearly was not within reaching distance of his car at the time of the search." *Id*. Indeed, the Court acknowledged that it would be rare for that not to be the case. *Id*. at 343 n.4 ("Because officers have many means of ensuring the safe arrest of vehicle occupants, it will be the rare case in which an officer is unable to fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains.").

Here, McCraney and Ammons were not handcuffed or secured in the back of a patrol car. They were standing, however, behind the Buick as instructed, two or three feet from the rear bumper, with three officers standing around them, while the other two officers on the scene conducted the search of the passenger compartment. Ricker testified that he stood approximately eight feet from McCraney, and watched him closely while the search was conducted. The officers outnumbered the detainees and, although not formally arrested, handcuffed or secured in a patrol car, the district court did not err

---

[3]The government makes no claim that it was reasonable to believe the Buick contained evidence of either driving with a suspended license or unlawful entrustment. *See id*. at 344 ("Gant was arrested for driving with a suspended license—an offense for which police could not expect to find evidence in the passenger compartment of Gant's car."). Nor was there a reasonable basis to conclude that the Buick contained evidence relevant to the traffic violation that provided probable cause for the stop. *See id*. at 343. ("In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence.")

in finding that the officers could not reasonably believe McCraney and Ammons were "within reaching distance" of the passenger compartment at the time of the search. Given the narrowed scope of the exception in light of *Gant*, the search may not be justified as a search incident to arrest.[4]

### 2.        Reasonable Suspicion

Alternatively, the government argues that the search was constitutionally reasonable under *Michigan v. Long*, 463 U.S. 1032, 1049 (1983), which authorizes a protective search of the passenger compartment where the officer "possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). A search based on such reasonable suspicion is permissible even if the suspect is detained outside the vehicle because "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id*. at 1052. Whether such reasonable suspicion of danger existed—the dispositive question in this case—is determined from examination of the individual factors under the totality of the circumstances. *United States v. Shank*, 543 F.3d 309, 314 (6th Cir. 2008); *United States v. Graham*, 483 F.3d 431, 438 (6th Cir. 2007); *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006).

Without expressly resolving the factual dispute, the district court accepted Ricker's testimony that there were two instances of suspicious movement inside the Buick. With no challenge to the factual findings, we also accept this testimony. The district court seized on Ricker's admission that, despite these observations, he would have let McCraney drive away in the Buick if his license had not been suspended and

---

[4]The government's reliance on dicta from this court's decisions in *Walker* and *Davis* is of little assistance because neither case involved a vehicle search incident to lawful arrest. *See United States v. Walker*, 615 F.3d 728, 733-34 (6th Cir. 2010) (explaining in dicta that even if *Gant* applied to a *Terry* stop and search of a duffel bag, the officers did not have the scene under control and the defendant stood only three feet from the duffel bag at the time of the search); *United States v. Davis*, 341 F. App'x 139, 141 n.2 (6th Cir. 2009) (explaining in dicta that even if *Gant* applied to a protective vehicle search based on reasonable suspicion, the defendant was restrained only a few feet from the vehicle).

allowed McCraney to arrange for his aunt to come get them and the Buick.  From this perceived inconsistency, the district court concluded that Ricker's actions were not those of an officer in possession of reasonable suspicion to support a protective search of the vehicle.  Keeping in mind that this is an objective inquiry, it was not clear error for the district court to find that the factors relied on by the government, including the suspicious movement, did not support a reasonable belief that the detainees were armed or could have gained immediate control of weapons.[5]

This court has recognized that suspicious movements made in response to police presence may properly contribute to an officer's suspicions. *Caruthers*, 458 F.3d at 466; *Graham*, 483 F.3d at 439.  Here, as Ricker followed the Buick without activating the lights or siren, he observed movement by both the driver and the passenger as they leaned down toward the floor as if concealing something under the seat.  Officer Maier reported the same kind of movement after he arrived on the scene and stopped behind and to the side of the Buick.  This kind of movement, in Ricker's experience, indicated an attempt to conceal a firearm or contraband from view.

In addition, the stop occurred late at night, at nearly 1:00 a.m., although there was no suggestion that it was a "high-crime" area.  *See Caruthers*, 458 F.3d at 467 (explaining that contextual factors such as presence in a high-crime area are relevant but should not be relied upon too easily or too heavily).  Nor was there an anonymous tip or other information indicating the possible involvement of the Buick or its occupants in other criminal activity.  *See id*. at 465 (finding anonymous tip of gun-wielder's appearance and location was relevant but would not alone justify a *Terry* stop); *Graham*, 483 F.3d at 439 (declining to hold that the tip in that case alone would justify a protective search).

Rather, the Buick came to the attention of the officer because the driver failed to dim the headlights.  This provided probable cause to make a traffic stop, but not a

---

[5]Although the district court was skeptical of Ricker's testimony that he allowed the call as a ruse to avoid escalating the situation, it does appear that Ricker allowed the call while concealing the decision to arrest and delaying the formal arrests until the detainees were out of the car and a vehicle search had been conducted.

basis for reasonable suspicion that the occupants might be armed and dangerous. *See Graham*, 483 F.3d at 436 ("It is hard to imagine how suspicion of a parking violation, by itself, could ever justify a protective search of a suspect's person."). Nor would the existence of probable cause to arrest Ammons for driving with a suspended license and McCraney for unlawful entrustment arouse reasonable suspicion to believe they were dangerous. Finally, the fact that McCraney tried to get out of the Buick twice while Ricker was checking the driver's identification does not add to the suspicion that the occupants were armed. According to Ricker's description, it was not an attempt to flee, but an attempt to get Ricker's attention, and was not accompanied by otherwise suspicious behavior.

Examining all of the factors, taken together, the district court did not err in concluding that the officer did not have reasonable suspicion to justify a protective search of the vehicle.

**AFFIRMED**.